## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

EX REL. EDWARD J. BURLBAW and
EX REL. DONALD D. BUSTAMANTE,

   Plaintiffs,

v.            No. CIV 99-1443 BB/LFG

J. MICHAEL ORENDUFF, et al.,

   Defendants.


## OPINION

  This matter comes before the Court pursuant to several motions filed by the parties:  a motion to strike certain defenses or require Defendants to file an "appropriate" answer (Doc. 138); a motion for summary judgment based on qualified immunity (Doc. 157); and motions by each side to strike portions of affidavits filed by the other side in support of each side's summary-judgment submissions (Docs. 204, 205).  The Court has considered the submissions of the parties and the applicable law and, for the reasons set forth below, will grant the motion for summary judgment.  Doing so renders moot the motion to strike certain defenses, and it will be denied.  In addition, the motions to strike affidavits are each meritorious in part, and will therefore be granted in part.

  As the Court has explained in a previous opinion, *United States ex rel. Burlbaw v. Regents of New Mexico State University*, 324 F.Supp.2d 1209 (D.N.M. 2004), this is a False Claims Act ("FCA") case, in which the relators ("Plaintiffs") contend  the individual Defendants made false statements to the federal government in order to obtain various contracts.  The relevant facts of the case are adequately summarized in the previous opinion, and the Court will not repeat them here.

Since that opinion was issued, the Court has allowed Plaintiffs to conduct limited discovery; following that discovery, the parties filed the motions listed above.

**Motions to Strike:**  Each party objects, on the basis of hearsay, to certain statements made in affidavits filed by the opposing party.  Some of these objections have merit.  For example, the affidavit of Plaintiff Burlbaw contains several paragraphs relating what he (Burlbaw) was told by various employees of the Physical Sciences Laboratory ("PSL").  Plaintiffs attempt to characterize these statements as admissions of a party-opponent, or alternatively as statements made by agents of the individual Defendants.  Neither of these attempts bears scrutiny.  The PSL is not a party to this litigation, and the individuals making the statements similarly are not parties.  Furthermore, the affidavit does not contain sufficient information to indicate that the individuals making the statements should be considered agents of any of the individual Defendants.  The mere fact that these individuals were subordinates of some of the Defendants, or colleagues of the Defendants, is not enough to make them agents of any Defendant, absent evidence that they were directly supervised by a Defendant or were otherwise directly controlled by a Defendant.  *See United States v. Agne*, 214 F.3d 47, 54-55 (1st Cir. 2000) (statements of corporate employee may be admitted against corporate officer only under certain circumstances giving rise to agency relationship).  Burlbaw's affidavit, however, indicates there was at least one layer of supervision intervening between the individuals making the statements and any Defendant.

Similarly, hearsay problems are present in the affidavit of Defendant Birx, in which he avers that he has "been told on a number of occasions by DOD officials that NMSU qualified as a minority institution..."  These officials are not named and no information is provided that could allow a determination as to whether they were authorized to speak on behalf of the government, or were speaking within the scope of their employment.  Such a determination is necessary to determine

2

whether the statements by the "officials" are admissions of a party-opponent and therefore not hearsay.  Rule 801(d)(2)(D), F.R.E.  To the extent these statements are introduced for the truth of the matter asserted, that New Mexico State University ("NMSU") did qualify as a minority institution, they are not admissible.

In the interest of brevity, the Court will not further review the challenged affidavits.  Instead, the Court advises the parties that the portions of the affidavits that are not admissible or, if admissible, are not relevant to the motion for summary judgment, have been ignored.  The parties will be able to determine what portions, if any, of the affidavits have been considered by the Court by reviewing the section of this opinion dealing with the merits of the motion for summary judgment.

### Motion for Summary Judgment

**Availability of Qualified Immunity As a Defense:**  As noted above, the motion for summary judgment is based on Defendants' claim of qualified immunity.  Plaintiffs initially contend that the qualified-immunity doctrine does not apply in FCA cases.  In support of this argument, they advance several contentions:  (1) the FCA itself contains a provision effectively immunizing certain federal officials from liability, and this provision is the exclusive form of immunity available under the FCA; (2) the only reported case decided under the FCA has rejected the availability of qualified immunity, at least for purposes of the retaliation provision of the FCA; (3) qualified immunity is unavailable under the FCA because the statute does not protect individual rights, unlike other federal statutes; and (4) a claim of good faith immunity is inconsistent with the FCA's scienter requirement,

which requires that the individual knowingly submit a false claim.  As discussed below, the Court does not accept any of these arguments.[1]

The first argument is based on 31 U.S.C. § 3730(e), which states that under certain circumstances, "[n]o court shall have jurisdiction over an action brought" against a member of the armed forces, Congress, or the judiciary, or a senior executive branch official.  This provision in effect provides a limited form of absolute immunity to those individuals.  Plaintiffs contend that Congress must have intended this to be the only type of immunity available to government officials under the FCA.  The Court does not agree that a Congressional intent to preclude application of the doctrine of qualified immunity can be discerned simply from the fact that Congress granted absolute immunity to certain officials under certain circumstances.  The practice of granting qualified immunity to state officials performing discretionary functions was well-established in 1986, when Congress amended the FCA and enacted the current version of the "immunity" provision.  *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *Scheuer v. Rhodes*, 416 U.S. 232 (1974); Pub. L. 99-562 (FCA amendments act of 1986).  Congress is presumed to be aware of existing law, and is therefore presumed to be aware of government officials' general entitlement to qualified immunity.  *See In re: Griffith*, 206 F.3d 1389, 1393 (11th Cir. 2000) (courts assume Congress is aware of existing law when it passes legislation).  The fact that Congress remained silent concerning qualified immunity, while enacting an extremely limited form of absolute immunity for certain officials, is not an indication that Congress intended to preclude the application of the generally accepted doctrine of qualified

---

[1]Defendants contend the Court has already decided they are entitled to raise the defense of qualified immunity, in the Court's previous opinion.  *See Burlbaw, supra*, 324 F.Supp.2d at 1215. The Court's holding in that opinion, however, was that Defendants are not entitled to absolute immunity in this FCA case.  The Court did not address any of the arguments now raised by Plaintiffs.  For that reason, the Court does not consider the prior opinion to be law of the case on the qualified-immunity question, despite the dicta indicating Defendants would be entitled to, at most, qualified immunity.

immunity to FCA cases.  In fact, the courts have indicated that the defense of qualified immunity is so well established that Congress "should specifically say so" if it wishes to abrogate the defense for a particular statute.  *Tapley v. Collins*, 211 F.3d 1210, 1214 (11th Cir. 2000) (holding defense of qualified immunity is available under Federal Wiretap Act, despite the fact that statute includes a good-faith defense).  Furthermore, the Court's review of the legislative history of the 1986 amendments reveals nothing that would indicate such an intent on the part of Congress.  *See* S. Rep. 99-345, *False Claims Amendments Act of 1986*, 1986 U.S.C.C.A.N. 5266, 1986 WL 31937.  Finally, the Court notes that granting absolute immunity to a few officials under certain circumstances is quite a different matter than addressing the question of qualified immunity for all officials, and the two concepts are in no way mutually exclusive.  *Cf. Tapley*; *Gonzalez v. Lee County Hous. Auth.*, 161 F.3d 1290 (11th Cir. 1998) (recognizing qualified immunity defense applies in Wiretap Act cases and in Fair Housing Act cases, even though each statute contains good faith defense).

Plaintiffs next point to the fact that the only reported case concerning the FCA and qualified immunity has rejected the application of the defense, at least in the context of retaliation cases.  *See Samuel v. Holmes*, 138 F.3d 173, 178 (5th Cir. 1998).  The rationale advanced for that result in *Samuel*, provided in one short paragraph, is that granting qualified immunity to officials who fire whistle-blowing employees would be at odds with the purposes of the anti-retaliation provision of the FCA.  However, this is true of applying qualified immunity to any statute.  The protections offered by qualified immunity are only necessary where a statute or the Constitution has been violated; if no violation has occurred there is no need to grant immunity, qualified or otherwise, to an official.  *See Wilson v. Layne*, 526 U.S. 603, 609 (1999) (initial inquiry in qualified-immunity case is whether a constitutional violation has occurred at all); *Bella v. Chamberlain*, 24 F.3d 1251, 1254 (10th Cir. 1994) (same).  Therefore, applying qualified immunity and thereby precluding an

5

assessment of liability will always be contrary to the purposes of a statute or the Constitution. As the Supreme Court has explained, recognizing a qualified immunity defense is an attempt to balance competing societal values:  the importance of a damages remedy to protect the rights of citizens, versus the need to protect government officials who are required to exercise their discretion and the related public interest in encouraging those officials to vigorously exercise their authority. *Harlow v. Fitzgerald, supra*, 457 U.S. at 800; *see also Stewart v. Donges*, 915 F.2d 572, 579 (10th Cir. 1990). The Court therefore declines to follow the holding of *Samuel*, and will instead apply the generally-accepted law of qualified immunity.[2]

Plaintiffs' next argument is that qualified immunity should not apply because, in contrast to § 1983, the FCA does not protect individual rights. Plaintiffs cite no authority for this proposition, and do not explain why this fact should lessen the protection provided by qualified immunity to government officials acting in good faith. It is to be hoped, if there is a difference between protecting individual rights and protecting the government's money, officials should be encouraged more strongly to protect individual rights. Presumably, then, immunity should be available less easily when statutes protecting individual rights are involved, and the fact that the FCA protects the government's money rather than individual rights actually militates in favor of applying qualified immunity, not

---

[2]It is important to note that, while the Supreme Court first applied the common-law doctrine of qualified immunity in 42 U.S.C. § 1983 cases, the doctrine has been applied to many other federal statutes which, because they provide their own remedy, are not enforced through § 1983. *See Tapley*, *supra*, 211 F.3d at 1215, n. 9 (listing cases applying qualified immunity to statutes such as the federal RICO statute, the ADA, the Food Stamp Act, the Sherman Antitrust Act, and more). For this reason the Department of Justice has cautioned, "Accordingly, even where a complaint seeks damages against an official under a statute that expressly provides a damages remedy (including one that provides a limited defense), consideration must be given to whether some degree of immunity is available." 3 *Department of Justice Manual,* § 4-15A.400, pp. 4-445, as quoted in John T. Boese, 1 *Civil False Claims and Qui Tam Actions* § 2.07[B][1], p. 2-201 (2d Ed. 2005).

against it.  A government official who, in good faith, applies for a grant or contract with the federal government should at minimum have the same access to immunity as a government official who in good faith makes decisions affecting an individual's rights.  The focus of the qualified-immunity doctrine is to encourage vigorous decisionmaking by government officials; this focus does not change depending on the nature of the interests protected by the statute in question.          Plaintiffs' final argument is that the qualified-immunity doctrine is inconsistent with the intent requirement of the FCA.  Plaintiffs point out that the statute requires a knowing submission of a false claim, and argue that an official cannot be acting in good faith (as is required to obtain qualified immunity) if he or she knows a false claim has been submitted to the federal government.  *See* 31 U.S.C. § 3729(a) (imposing liability on a person who knowingly presents a false claim); *Gray v. Baker*, 399 F.3d 1241, 1245 (10th Cir. 2005) (qualified immunity shields public officials from civil liability based on having acted in good faith in the exercise of their duties).  However, even where the substantive law makes an official's state of mind an essential element of the plaintiff's claim, qualified immunity will support a summary judgment on the appropriate record.  *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 648 (10th Cir. 1988).

**Merits of Qualified Immunity Defense:**  When a qualified immunity defense is raised at the summary-judgment stage, the following analysis must be applied.  Plaintiffs must overcome a "heavy two-part burden."  *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).  Plaintiffs must first establish that the facts adduced to date, viewed in the light most favorable to Plaintiffs, show there was a violation of a statutory right.  *Id.*  If Plaintiffs can do so, they must then show the statutory right was clearly established.  *Id.*  Specifically, since this is an FCA case, Plaintiffs must establish that the evidence, viewed in Plaintiffs' favor, raises an issue of fact as to whether any Defendant *knowingly* presented a false claim to the federal government.  31 U.S.C. § 3729(a); *United States ex*

*rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (FCA condemns fraud but not negligent errors; defendant must have known statement was false at time it was made to the government).  The FCA defines the term "knowingly" as having actual knowledge of certain information, or acting in deliberate ignorance of the truth or falsity of the information, or acting in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b); *see United States ex rel. Swafford v. Borgess Med. Ctr.*, 98 F.Supp.2d 822, 832 (W.D. Mich. 2000), *aff'd*, 24 Fed.Appx. 491 (6th Cir. 2001).  Therefore, the question becomes whether there is evidence that any Defendant deliberately or recklessly, and falsely, submitted claims to the federal government.  If there is such evidence, the Court must reach the second part of the test, whether at the time Defendants acted, it was clearly established that their actions violated the FCA.  *Id.*

Plaintiffs' argument that the FCA was violated proceeds as follows:  (1) when the PSL first began applying for grants and contracts with the Department of Defense ("DOD") as a minority institution ("MI"), NMSU was eligible to apply as such, because it qualified as a Strengthening Institution under Department of Education ("DOE") guidelines; (2) starting in December 1993, new statutory requirements governed NMSU's eligibility as an MI; (3) these new requirements did not include the strengthening-institution factors under which NMSU had previously qualified; (4) instead, the new requirements mandated that NMSU either have an enrollment of more than 50%  minority students, or qualify as a Hispanic-serving institution;[3] (5) NMSU did not have a 50%-or-greater enrollment of minority students, and did not have information about the income levels or first-generation status of its Hispanic students, and therefore did not meet the new statutory requirements;

---

[3]Until 1998, a Hispanic-serving institution was one which had more than 25% Hispanic students, with more than 50% of those Hispanic students being low-income and first-generation college students, and another 25% being either low-income or first-generation college students. After 1998, such an institution was simply one which had more than 25% Hispanic students, of which more than 50% were low-income students.

(6) the contract or grant documents signed by Defendants[4] referred to the statutory provisions governing the MI requirements; and (7) Defendants signed the documents certifying that NMSU qualified as an MI, despite the fact that NMSU did not so qualify under the statutory provisions in question.  Plaintiffs have submitted evidence at least raising an issue of fact regarding the above factual assertions, and the Court accepts them as true for purposes of this motion.

Defendants respond to the above argument by claiming that, at all times in question, the DOD used a list of MIs formulated by the DOE to determine whether an institution qualified as an MI for DOD contracting purposes.  Defendants also maintain that NMSU appeared on the DOE list during the period in question, and that the MI certifications submitted by Defendants were based on the fact that NMSU appeared on the DOE list.  In short, Defendants argue that the federal government told them NMSU was an MI for contracting and grant purposes, and  Defendants were not required to contradict the government's own assurances when applying for contracts and grants.  This is true, according to Defendants, even if it turns out that NMSU could not meet the statutory criteria for MIs contracting with the DOD.  Plaintiffs, however, reject this argument, stating that Defendants had a duty to investigate NMSU's minority enrollment and determine whether the statutory criteria were met, regardless of whether NMSU appeared on the DOE list or not.  According to Plaintiffs, the bottom line is that Defendants were not entitled to rely on what NMSU was told by the federal government, but were required to independently verify NMSU's MI status before submitting certifications to the government claiming such status.

The Court discerns two major issues in the parties' arguments.  First, there is the factual question of whether the undisputed facts, or the facts viewed in the light most favorable to Plaintiffs,

---

[4]Except for Defendant Meyer, who did not sign any contracting documents at all; where the opinion refers to "Defendants" signing documents, it should be understood that Meyer is excepted from that statement.

support Defendants' assertions that: (1) the DOD had a policy of relying on the DOE list of MIs as determinative of an institution's MI status for contract/grant purposes; (2) NMSU in fact appeared on the DOE list during the times in question; and (3) NMSU was assured by the DOD that if it was on the DOE list, it was eligible to apply for contracts and grants as an MI. Second, there is the legal question of whether Defendants were entitled to rely on the actions of the DOD and the DOE, or had a duty to independently verify NMSU's eligibility as an MI in order to avoid violating the FCA.

Review of the evidence submitted by the parties indicates that, rightly or wrongly, the DOD's contracting officials did consider the DOE's list of MIs as determinative throughout the time period from December 1993 to at least fiscal year 2001. For example, in April 1994, shortly after the MI requirements had changed,[5] the DOD issued a memorandum concerning the new MI requirements. [Exh. 7 to Birx Affid., Exh. A, MSJ] This memorandum stated that the DOE had provided a list of institutions in response to the DOD's request for "a list of schools that meet the new minority institution criteria..." [*Id.*] NMSU appears on the list attached to the memorandum. The memorandum also stated that the DOD expected "to obtain annual updates to this list from the Department of Education." Any institution contending that it met the eligibility guidelines, but not appearing on the list, was advised to contact the DOE to obtain information about how to be included on updated lists. [*Id.*] The clear implication from this memorandum is that the DOD would rely exclusively on the DOE's list of MIs, when assessing an institution's eligibility for MI set-aside contracts and grants.

Subsequently, the DOD periodically confirmed that if an institution was listed as an MI on the DOE list, the DOD considered that institution to qualify for MI treatment under the applicable

---

[5]The Court is accepting Plaintiffs' representation that the date of the change was December 1993, since Defendants have not challenged that date. The Court has not independently verified that this date is accurate.

statutes.  In January 1996, the Department of the Army issued a "Broad Agency Announcement" concerning the minority set-aside program.  [Exh. C, MSJ]  In this announcement, under the "Eligibility" section, the Department recited the statutory definition of MIs, stated that the most recent list of institutions meeting the statutory criteria was attached, added that the list was compiled by the DOE, and instructed anyone with questions about the MI list to contact the DOE, "**not** ... the Department of the Army." [*Id.* (emphasis in original)]  NMSU appeared on that list.  [*Id.*, Appendix A]  Almost five years later, in November 2000, the DOD's director of the office of small and disadvantaged businesses indicated, in a letter to the then-United States Attorney for this district, that the DOD historically "has used and continues to use the MI list provided by the Department of Education as the official list of institutions eligible to participate in the HBCU/MI programs." [Exh. D, MSJ]  Also, presumably at some point during the year 2000, the DOD announced a program of grants for university research for fiscal year 2001, encouraging applications from MIs, and noting that the DOE "maintains the list of U.S. accredited postsecondary institutions that currently meet the statutory criteria for identification as minority institutions..." [Exh. 18 to Birx affidavit, Exh. A, MSJ]  Finally, the DOD's practice has been enshrined in its regulations concerning MI contracting; under these regulations, an MI is defined as an institution that has been determined to be an MI by the Secretary of Education. *See* 48 CFR § 226.7005 (referring to 48 CFR § 252.226-7000 as establishing MI status); 48 CFR 252.226-7000 (requiring institution to provide evidence that Secretary of Education has determined the offeror to be an MI).

There is no contemporaneous evidence contradicting the above documents, or tending to show that the DOD did not in fact consider the DOE lists to be determinative of MI status for

purposes of the minority set-aside program.[6]   Furthermore, Defendants have submitted many documents establishing that NMSU consistently appeared on various DOE lists involving minorities and MIs during the period in question, and was notified of this fact by the DOE.  [*e.g.,* Birx Affid., MSJ Exh. A, Exhs. 6, 8-11, 13, 14, 19]  Defendant Birx indicated in his affidavit that he relied on statements by NMSU administrators and by DOD contracting officers when he signed documents certifying that NMSU qualified as an MI.  [Exh. A, MSJ]  There is no evidence that, until April 2000 (when Birx was interviewed by DOD investigators), Birx or any other Defendant was notified that the DOE lists might not accurately reflect the applicable statutory criteria.[7]   [*Id.*]  In sum, the undisputed evidence is that the DOE consistently told NMSU it was eligible for MI status for various purposes; that the DOD used these DOE lists, and only these DOE lists, to determine which institutions were eligible for MI set-aside contracts and grants; that NMSU appeared on the lists used by the DOD; and that no Defendant (at least until April 2000) had any idea there was a problem with the DOE lists.

_____

[6]Plaintiff Bustamante does state, in his affidavit, that the DOE did not make determinations as to NMSU's MI status "on behalf of" the DOD.  This statement does not raise an issue of fact concerning the DOD's practices with respect to MI eligibility, for two reasons.  First, Bustamante does not provide any indication that he had personal knowledge of the manner in which the DOD determined an institution's MI eligibility; his statement, therefore, which contradicts the written statements of the DOD itself, is entitled to no weight.  Second, even if the DOE did not intend to make any determinations on behalf of the DOD, the undisputed written record establishes that the DOD used the lists compiled by the DOE as conclusive evidence of which institutions qualified for MI treatment by the DOD.

The record also contains a letter to NMSU from the U.S. Army, stating that NMSU may have falsely certified itself as an MI from 1996 to 1999, because it did not meet the *statutory* (emphasis in original) criteria.  [Exh. 10, Resp. to MSJ]  This letter was not written until February 2002; therefore, this after-the-fact statement does not contradict the evidence concerning the DOD's statements and practices during the period in question for purposes of this lawsuit.

[7]The period after April 2000 will be dealt with separately, below.

Plaintiffs' response to the above facts is simply that they don't matter.  Plaintiffs point to the fact that every contracting document signed by Defendants contained language citing to the correct statutory provisions governing MI status for DOD purposes.[8]  According to Plaintiffs, Defendants had a duty to read the statutes referenced in the contract documents and then determine whether NMSU met the requirements of those statutes, rather than simply relying on what they were told by the DOE, the DOD, or other NMSU officials.  Plaintiffs contend in essence that Defendants should have investigated the low-income and first-generation-college-student status of the Hispanic student population at NMSU, to decide for themselves whether NMSU met the statutory criteria, before certifying that NMSU was an MI for DOD-contracting purposes.

The Court does not agree with Plaintiffs' position.  "[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations.  The FCA is a fraud prevention statute; violations of ... regulations are not fraud unless the violator knowingly lies to the government about them."  *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999).  Thus, the FCA is violated only by deliberate falsehoods or, at minimum, statements made with reckless disregard of their truth or falsity.  *See, e.g., United States v. Taber Extrusions, LP*, 341 F.3d 843, 845 (8th Cir. 2003); *United States ex rel. Siewick v. Jamieson Science and Eng'g*, 214 F.3d 1372, 1378 (D.C. Cir. 2000); *United States ex rel. Local Union No. 38 v. C.W. Roen Constr. Co.*, 183 F.3d 1088, 1092 (9th Cir. 1999); *United States ex rel. Aakhus v. Dyncorp., Inc.*, 136 F.3d 676, 682 (10th Cir. 1998); *United States v. Medica-Rents Co.*, 285 F.Supp.2d 742, 769-771 (N.D. Tex.

---

[8]The contracting documents themselves did not contain a definition of an MI; instead, they recited a phrase from 10 U.S.C. § 2323(a)(1)(C), and referred to minority institutions as those "meeting the requirements of section 1046(3) of the Higher Education Act of 1965," with a statutory citation, as well as "Hispanic-serving institutions" as defined in another statute.  [*E.g.,* Exh. 3, Resp. to MSJ, several highlighted portions]  A person reading the contracts, therefore, would not know how an MI was defined, but would have to refer to the statutes themselves for a definition.

2003). Neither negligent misstatements nor innocent mistakes are sufficient to establish liability under the FCA. *Id.* Where the government has assured a contracting party that a certain fact is true, and the contracting party has no reason to doubt the government's assurances, it is not a reckless or deliberate falsehood to rely on those assurances in making a claim to the government. *See United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288-89 (4th Cir. 2002) (government agency instructed FCA defendant to change budgeting and reporting codes; this change was basis of FCA claim; court held that defendant had a right to rely on agency's instructions, and affirmed summary judgment in favor of defendant); *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) (in order to expedite a project, government agents told FCA defendant to submit invoices for excavation work, even though work actually performed was dredging; this discrepancy was basis for FCA claim; Seventh Circuit refused to hold defendant liable for defrauding government by following government's explicit directions); *United States ex rel. Werner v. Fuentez Systems*, 319 F.Supp.2d 682, 686 (N.D. W.Va. 2004), *aff'd* 115 Fed.Appx. 127 (4th Cir. 2004) (scienter requirement negated by Coast Guard instructions to bill for events); *cf. Shaw v. AAA Eng'g and Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000) (recognizing "...there may still be occasions where the government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA.").

   As discussed above, there is no evidence that any Defendant engaged in a deliberate falsehood when certifying that NMSU qualified as an MI for purposes of DOD contracting. Defendant Meyer provided information about NMSU's student enrollment to the DOE, and there is no suggestion in

14

the record that the information she provided was false.[9]  The DOE reviewed the information and

placed NMSU on its list of MIs.  The DOD then used this list to determine which institutions qualified

as MIs, even though the list was based on different criteria than the statutory criteria the DOD was

supposed to be using, and informed NMSU that if NMSU appeared on the DOE list it could apply

for minority set-aside grants as an MI.  Defendants, by following the DOD's instructions, did not

deliberately defraud the government.

Furthermore, Defendants did not act in reckless disregard of the truth by certifying that

NMSU qualified as an MI.  In addition to the fact that NMSU appeared on the very list used by the

DOD to assess MI eligibility, a list compiled by another government agency, it is important to note

that the statutes and regulations applicable to the DOD specifically authorized the DOD to rely on

the DOE's decisions as to MI status.  *See* 10 U.S.C. § 2323 (a)(1)(C) (for DOD's set-aside program

purposes, MI is to be defined as it is in Higher Education Act); 20 U.S.C. § 1067k (3) (Secretary of

Education is responsible for verifying MI enrollment information in order to classify an institution as

an MI); 48 CFR §§ 226.7008, 252.226-7000 (regulations cited above, instructing the DOD to use

language in MI set-aside contracts which requires institutions, upon request by the DOD, to provide

evidence that the DOE has determined the institution is an MI).  Given this statutory and regulatory

background apparently authorizing the DOD to rely on the DOE's MI determinations in order to

decide which institutions qualified as an MI for DOD contracting purposes, it was not reckless for

Defendants to accept what they were told by the DOD concerning NMSU's eligibility for treatment

as an MI.  At most, given the government's assurances, Defendants' failure to research the statutes

---

[9]For purposes of the DOD statute, the information was simply incomplete, as it did not contain any data about first-generation college status of Hispanic students, or the income of those students.  The DOE did not request this information from NMSU.  [*See, e.g.,* Exh. 9A to Birx Affid., Exh. A, MSJ (DOE forms concerning MI eligibility, requesting information only about financial-aid status of entire student body, not simply Hispanic students)]

and investigate the facts themselves constituted only negligent behavior, rather than reckless or deliberate action.  *Cf. United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 768 (8th Cir. 2002) (FCA defendants' failure to seek legal advice or an opinion from Medicare prior to submitting a billing could not be basis of FCA claim, where defendants considered the practice to be acceptable standard procedure).  As pointed out above, negligent acts do not give rise to liability under the FCA.  *AIDS Research Alliance-Chicago*, *supra*, 415 F.3d at 604; *Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002).

**Claims Arising After April 2000:**  Plaintiffs argue that at minimum, no Defendant can be granted qualified immunity for any MI certification made after April 18, 2000.[10]  On either that date or April 19, 2000, an investigator for the federal government ("Rogers") met with Defendant Birx to discuss NMSU's status as an MI.  [Exhs. 9, 12, Resp. to MSJ]  Rogers informed Birx that the statutory requirements for MI status appeared to be different for the DOD than for the DOE.  [*Id.*] He also informed Birx that for DOD purposes, the status of NMSU's minority students as first-generation college students and as low-income students was an essential part of MI eligibility.  [*Id.*] At that point, argue Plaintiffs, Birx was on notice that NMSU did not qualify as an MI for DOD purposes, and he cannot claim qualified immunity for any MI certifications made to the DOD following the meeting with Rogers.  In fact, Plaintiffs maintain summary judgment should be granted in their favor as to any such certifications.

Defendants' first argument against Plaintiffs' position is a procedural argument rather than an argument on the merits.  Defendants maintain that Plaintiffs have not alleged that any Defendant submitted a false statement later than April 11, 2000, a date before the meeting between Rogers and

----

[10]The only Defendant who would appear to be affected by this argument is Defendant Birx; there is no evidence in the record that any other Defendant made or participated in any MI certifications to the government after April 18, 2000.

Birx.  However, this Court required Plaintiffs to file a more definite statement, which would enable Defendants to adequately determine the claims raised by Plaintiffs.  Plaintiffs' statement in response to the Court's order contains sections detailing the allegations against each Defendant.  [Doc. 133, par. 28-67]  The latest false statement alleged against Birx was a certification he made dated April 11, 2000.  [*Id.*, par. 39]  Plaintiffs did, however, allege a false statement by Defendant Conroy on April 19, 2000, and in the general allegations of the more definite statement they claimed that "PSL employees" falsely certified MI status shortly after the Rogers/Birx meeting.  [*Id.*, par. 14]  Therefore, the Court finds there were allegations of FCA violations post-dating April 18, 2000, and the Court will analyze the evidence presented to determine whether a grant of qualified immunity is warranted for any statements made following that date.

The only evidence in the summary-judgment record of a possible MI certification dated after April 18, 2000 is a letter from Barbara Pritchard, Contract Administrator for the PSL, to a DOD contracting officer at the White Sands Missile Range, dated May 2, 2000.  [Exh. 12, Resp. to MSJ][11] In this letter Ms. Pritchard states that on April 18, 2000, "we" were notified there apparently are

---

[11]The only other documents the Court could locate in the entire case record that might relate to a specific MI certification were the following:  (1) a letter dated April 19, 2000, from Defendant Birx to an Army officer, submitting additional information in light of the meeting between Birx and Rogers; this letter does not itself contain a certification, but notifies the Army of the possible conflicts concerning MI certification between different government agencies; therefore, the Court does not consider it an MI certification that might be considered a false statement [Exh. 17 to Birx affid., Exh. A to MSJ], *see United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (Jones, J., concurring); *Aakhus, supra,* 136 F.3d at 683; and (2) some draft proposals, dated long after April 2000, containing statements certifying that NMSU is an MI "under 48 CFR Chapter 2, Part 226.70 and is on the Department of Education list of Title III eligible institutions..."; since these proposals are drafts and there is no indication they were finalized and submitted to the DOD, the Court has not considered them either.  [Exh. 9 to Doc. 133, Relators' More Definite Statement];  *Hutchins v. Wilentz, Goldman, & Spitzer*, 253 F.3d 176, 184 (3d Cir. 2001).  Furthermore, the Court notes Plaintiffs have not argued in their summary-judgment briefing that any of these documents constitute an actionable false statement.

17

different requirements between government agencies, as to MI status.  The letter then sets out NMSU's certification, for purposes of two pending proposals or contracts: "That New Mexico State University has qualified for Minority Institution status under 48 CFR Chapter 2, Part 226.70 and 34 CFR 607.2 through 607.5 and has been placed on the Department of Education List of Title III eligible institutions for FY 1999."  [*Id.*]  Attached to Ms. Pritchard's letter was a letter to NMSU from the DOE, designating NMSU as eligible to apply for a grant under Sections 607.2 through 607.5 of 34 CFR.  [Pltf. Resp. to MSJ, p. 12, par. 9]

Plaintiffs argue that the "recertification" letter discussed above, following the meeting between Birx and Rogers, is clearly a false claim as to which qualified immunity may not be granted.[12]  They contend the letter's references to 34 CFR and 48 CFR, while omitting any mention of the statutes defining MI for the purposes of DOD contracting, constituted a false statement claiming NMSU eligibility for DOD minority set-aside contracts.  The Court disagrees.  "[W]here disputed legal issues arise from vague provisions or regulations, a contractor's decision to take advantage of a position can not result in his filing a 'knowingly false claim.'" *Southland Mgmt. Corp., supra*, 326 F.3d at 682 (Jones, J., concurring); *see also Siewick, supra,* 214 F.3d at 1378; *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478-79 (9th Cir. 1996); *Medica-Rents, supra*, 285 F.Supp.2d at 772.

---

[12]One issue not discussed by the parties is the fact that the "recertification" letter was written by Ms. Pritchard, who is not a Defendant in this case, rather than Birx.  Since individuals are the Defendants in this case, rather than the PSL as a whole, it is important to tie any alleged false statement to an individual named Defendant, and it is not enough to show that a possible false claim was submitted by a different employee of the PSL.  Giving Plaintiffs the benefit of the doubt, especially in light of Defendants' failure to challenge this aspect of the letter, the Court finds that the letter's reference to "we" could be interpreted to include Birx, who was at the meeting with Rogers.  Another possible, although more removed, inference is that Birx authorized Pritchard to write the letter to the DOD.

18

NMSU was faced with conflicting statements from government officials concerning its eligibility for MI status for DOD purposes.  Rogers told Birx NMSU was not eligible, and showed Birx statutory provisions that appeared to confirm this lack of eligibility.  [Rogers report, Exh. 9, Resp. to MSJ]  NMSU had previously been informed that it was eligible for MI status if it appeared on the DOE list of MIs.  Notified of these contradictions, Birx contacted the DOD and made a new certification via the Pritchard letter.  Significantly, this letter does not contain any false statements. At the time the letter was written NMSU did appear on the DOE list of Title III eligible institutions, and did qualify for MI status under the regulations adopted by the DOD, 48 CFR Section 226.70.[13] The letter notifies the recipient that the applicable statutory provision "has some additional requirements that can be interpreted in various ways."  [Exh. 12, Resp. to MSJ]  In sum, the letter discloses the possibility of a problem with NMSU's prior MI certification, attempts to correct that problem with an accurate certification as to the regulations and list under which NMSU did qualify as an MI, and provides an opportunity for the DOD to decide that NMSU was not, in fact, an MI under the applicable statutes.  It cannot be an actionable violation of the FCA for an individual to provide truthful information to the government, in order to allow the government to determine whether or not that information establishes eligibility for a certain program.  *Cf. United States ex rel. Costner v. United States*, 317 F.3d 883, 887-88 (8th Cir. 2003) (contractor that is open with the government about problems, and engages in a cooperative effort with the government to find a solution, lacks intent required to find a violation of the FCA); *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (government knew of contractor's mistakes and problems, because contractor was open with government about them; summary judgment affirmed

---

[13]As discussed above, this regulation conditions MI status, for DOD contracting purposes, on whether an institution is listed as an MI by the DOE.  *See* 48 CFR §§  226.7005, 252.226-7000.

because plaintiff failed to present evidence of requisite intent under FCA).  For this reason, the Court disagrees with Plaintiffs' assertion that the Pritchard letter can be construed as a false means of attempting an end-run around the statutory definition of an MI for DOD-contracting purposes.[14]

**Conclusion--Qualified Immunity:**  Plaintiffs have established at least an issue of fact as to the occurrence of violations of the statutory provisions governing the DOD's minority set-aside program.  However, this is not enough; it was incumbent on Plaintiffs to present evidence raising an issue of fact as to whether any Defendant knowingly or recklessly committed those violations.  Simply pointing to the statutes and claiming Defendants should have read them and researched NMSU's minority, first-generation, and low-income statistics is not sufficient, given the factual and regulatory background of this case.  From 1994 through at least 2000, the DOE told NMSU it was qualified as an MI, and placed NMSU on its list of MIs.  In addition, the DOD told NMSU that if it was on the DOE list, it was eligible to apply for, and receive, MI set-aside contracts.  There is no evidence that any Defendant had a reason to question this until April 18, 2000, when Birx met with Inspector Rogers.  Following that meeting, Birx (through Pritchard) notified the DOD there might be a problem with the MI certification, and accurately certified to what NMSU could truthfully say--NMSU qualified as an MI under the DOD's regulations, and appeared on the DOE's list of MIs.  Therefore, there is no evidence in this case of a knowing or reckless false certification by any Defendant.  An individual contracting with the government must be able to rely on government regulations and government requests for proposals without incurring liability under the FCA.  For these reasons,

---

[14]In fact, adding to the confusion facing NMSU, the DOD continued even after April 2000 to inform NMSU that if the DOE's list of MIs included NMSU, then NMSU was eligible as an MI for DOD purposes as well.  [Exh. 18 to Birx affid., Exh. A to MSJ]  In the face of this confusion, Birx did not violate the FCA by making accurate certifications concerning the type of MI eligibility NMSU did possess, even if there was not sufficient information to demonstrate that NMSU met the statutory definition of an MI for DOD purposes.

Plaintiffs have failed to raise an issue of fact concerning any Defendant's intent, and qualified immunity will be granted to all Defendants. Since Plaintiffs have failed to raise an issue of fact concerning the existence of an FCA violation, the Court need not address the "clearly established law" aspect of the qualified-immunity doctrine.

**Disposition**

Based on the foregoing, the Court will deny as moot the motion to strike certain defenses or require Defendants to file an "appropriate" answer (Doc. 138); will grant in part and deny in part the motions to strike affidavits (Docs. 204, 205); and will grant the motion for summary judgment based on qualified immunity (Doc. 157). This case will therefore be dismissed.

Dated this 15th day of November, 2005.

BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE

**Attorneys:**

**For Relators**
Duff H. Westbrook
Joleen K. Youngers
Maureen A. Sanders

**For Defendants**
Stephen S. Hamilton
Andrew S. Montgomery
Kenneth L. Harrigan
Alex C. Walker

**For the United States of America**
Howard R. Thomas